Case number 20-1424, Citadel Securities LLC petitioner versus Securities and Exchange Commission. Mr. Wall for the petitioner, Ms. Parisi for the respondent, Ms. Stetson for the intervener for the respondent. Good morning, Mr. Wall, whenever you're ready. Good morning, your honors, and may it please the court. The SEC has allowed a small for-profit exchange to interfere directly in the market in order to attract one side of that market and boost its revenues. In approving that change, the commission committed three errors that independently require reversal. First, the commission seriously misunderstood the data before it. Rather than look at particular trades, the commission relied on misleading statistics that show a lot of trading when the signal is on. Those statistics reflect normal trading activity, not phantom arbitrage. Large orders across multiple exchanges cause prices to move, which turns on the signal. Even after Citadel submitted data showing exactly that at Joint Appendix 372, the commission never addressed it. Second, even as... Mr. Wall, you just referred to phantom arbitrage. Do you think latency arbitrage exists? Judge Walker, I don't think the court has to get into it. All the court needs to say is that if it exists, the data here doesn't show it. Well, but part of the argument is whether or not the algorithm and the speed bump and all of the things that IEX have done here is sufficiently tailored enough to reduce latency arbitrage. And I couldn't tell from your brief whether your client acknowledges its existence even. And if you don't acknowledge its existence, it's hard to know how you can make an argument that the algorithm and the speed bump are not sufficiently tailored. Judge Walker, I think there's good reason to be extremely skeptical. 10, 12 years ago, sure, maybe. Now, no. Look, there are a lot of dogs that ought to be barking if this is the phenomenon that they say it is. The SEC has all the trading data in its MIDAS system, and IEX has access to the trades too. You'd think that somebody would be analyzing the actual trades to give you at least have firsthand accounts of people who were saying that particular cables were shorter, or here are the firms that have the better data speeds. In fact, the amici in this case, like XTX on the other side, which is one of Citadel's competitors, has the same connectivity and data. I doubt Ms. Parisi or Ms. Stetson will tell you that they have any competitive advantage or disadvantage vis-a-vis Citadel. So I think there are good reasons to be skeptical, Judge Walker, about whether this narrative in this day and age is true. But again, I don't need the court to agree with me on that. All the court needs to say is, look, they took there to be a problem because they took these numbers and said there's a lot of trading when the signal is on. And the numbers are meaningless because it's large trades that are turning on the signal. And that's the example that we gave at page 372 of the joint appendix. If you look, we supplied an actual trade to IEX and the commission and said, we sent out a large buy order across multiple exchanges because we were sweeping the market. We wanted a lot of shares of this particular stock. And IEX, because of the speed bump, looked at what was happening on all the other exchanges, correctly predicted that because there was a spike in demand, prices were going to move. It turned on the signal. And then you can't execute the last little piece in IEX. And the key- Judge Walker, you can finish your sentence, please. Oh, I was just going to say, Judge Walker, the key thing to understand is that IEX is a bit player. It only has about 2% market share. It doesn't have a lot of liquidity. There's, so to speak, there's not a lot of stuff sitting on its shelves. So if you're going, you're often going because you need a lot of something, including the last little piece at a place like IEX. And it's that last little piece that's making the signal turn on. It's got nothing to do with latency arbitrage. Let me ask, IEX says in its brief that you carefully avoided telling the commission and this court two things. And so I wanted to give you the opportunity to answer them if you want to, or to confirm that Citadel would rather not. The first is this. Citadel carefully avoided telling the commission and this court how much of its trading activity when the indicator is on, is on behalf of retail investors. So not true. As we explained- How much of your trading activity is on behalf of retail investors when the indicator is on. So we looked at one month of data and as we told them at page 313 of the joint appendix, we said more than 50% of the trades we sent you in one month, it's actually 56% were retail rather than proprietary. And of those Judge Walker, we said 15% turned on the signal because they were sufficiently large. It was the size of the order that was driving this. It had nothing to do with latency arbitrage. In response to that, here's what the commission did. It said, you say we mislabeled you as proprietary when in fact you do retail. We're just going to exclude your data from the analysis. I caught that. I remember that part. Let me ask the second thing that they say you avoided telling the commission and the court. They say you did not say whether retail investors as opposed to Citadel benefit from routing retail orders at the moments the indicator is on. So not true Judge Walker, but it's the flip side. As we explained to the commission, the retail investor is harmed. We're not bundling these retail orders. There's some anonymous comment letter. It provides no support for that. We told the commission it wasn't true and it's not true. A retail order comes in. Maybe we fill it internally if we have the volume or we send it out to the exchange. We send it out quickly. We send it out promptly and we do it across all the exchanges if it's a large order. Again, we gave an example at page 372 of the and what happens is, let me give you a really simple example just to make it concrete. Let's say you want a thousand shares of Apple. There's 500 on the New York Stock Exchange. There's 400 on NASDAQ and there's 100 at IEX. You hit the New York Stock Exchange and NASDAQ. You get your 900 shares. IEX sees that going on. It correctly predicts that because of the spike in the demand, the price is going to move. It ticks up a cent. So for those last 100 shares, that retail investor, you, you wanted the thousand shares, your mutual fund or you're investing on behalf of ordinary folks, you pay an extra dollar. Their only answer to that is not to look at the retail cost. They never consider that at all. All they say in the order and then in their brief is, well, you can just reroute. But the problem, Judge Walker, is now you jump from the frying pan into the fire. If you executed IEX first for the 100 shares, it's true. You don't pay the extra dollar. But you hold back the other two orders for the 900 shares. And as we told the commission, by the time you send them out, the shares may not be there or they may not be there at that price. So you're sort of damned if you do, even more damned if you don't. And if the commission had looked at all of this in some reasoned order and said, here are the benefits and the costs, I'd granted be a tougher case. But essentially they haven't looked at any of it. They say at page 41 of their brief, you can just reroute. We come back and say, well, you said in response to CBOE proposal that routing wasn't enough. And then they drop this footnote at page 55 to say, well, you're not going to need any material changes in routing. The brief is totally schizophrenic on it. You will need to reroute. That rerouting has costs. And the commission didn't consider those costs. So, Mr. Hall, is your argument that the S, I mean, are you making an argument that the SEC lacks the authority to counteract latency arbitrage? So if they had provided more reasoning or more data that they could attack this problem, or is your argument that they just simply don't have the authority under their statute? No, only on the only on the second of the protected quote side, they can't do what they're due. They can't protect the quotes because it's not consistent with the language of the regulation. But on the first of the two issues, the D limit argument, no judge route, if they had come in and presented actual evidence of arbitrage, they presented actual trades or even firsthand accounts from people who are writing the algorithms involved, if they had some reason to basis, and then if they had shown, look, we've isolated out the retail, we've isolated out the ISOs, the intermarket sweeps, we're still showing that we're actually picking up the arbitrage. We know that's going to impose some cost on retail investors on the liquidity taker side of the market. But here's why we think those costs are overbalanced by benefits. I mean, if they've done what you would expect in a well reasoned commission order, I think it's possible they could have done this. But this is just a sloppy order. It takes data, it misreads the stats, it assumes away all the costs. If you look at both the order and their brief to this court, it reads like it's all roses and no thorns. It doesn't have any consideration of the costs on retail or routing. And then just to finish up where I started Judge Rao, at a minimum, and this was the third error I was going to get to in my opening, they can't protect the quotes. The regulation says immediately and automatically executable. And the whole point of this is they're slowing it down so that it's not immediate. And then instead of automatically executing, they're automatically repricing. They're doing the exact opposite of what the regulation says. And so no, on that side of it, they can't do this absent another notice and comment rulemaking. So Mr. Long, the question of immediately, you know, the commission claims that it should get Kaiser deference for its interpretation of immediately. And it made that interpretation in 2016, when they did the when they did the initial IEX order. So so why shouldn't they get Kaiser deference in this context? So I'd say two things, Judge Rao. First is you don't get our if the language is unambiguous. And there's only I mean, the natural meaning of immediately and automatically is exactly what you think. No intentional delay, and no intervention. And that's exactly what the contemporaneous guidance said in 2005. If you look at page 534 of the adopting release, it is almost word for word what I just said, you are right, they came back in 2016. They read in a de minimis exception that has no tie whatsoever to the regulatory text. So first, I don't think the text is ambiguous enough to allow them to do it. And to Justice Kagan already told us in Kaiser, that an agency will rarely get deference if it flipped as it did here. And boy, this doesn't seem like a very good candidate for that at all. Because when they flipped in 2016, all they talk about is the purposes of the act. They don't make any effort to tie it to the text. Even the discussion of policy is pretty thin. And then when they revisit it here in 2020, Judge Rao, and this is at the top of page 83 of the joint appendix, it's literally two sentences. And only the second sentence doesn't work. And all it says is, we looked at this in 2016. And for the same reasons, we're doing it here. Except that here, they're doing it for displayed prices, this is supposed to be the prices that the market tells you the fair value is. And they never looked at whether repricing those frustrates the exchange act and its purposes. With Citadel, so Citadel, though, didn't challenge the interpretation in 2016. Well, in all fairness, not to this court, Judge Rao, we did challenge the commission, we put in comment letters pointing to the regulatory text. Now, but at the time, they said we're only doing this with non-display, right? The stuff you can't see that you just want to go fishing for in the dark, but we're not doing it to display prices. So we didn't petition this court for review. It wasn't until they did that here that we've come in, obviously, and brought it to this court. And at the end of the day, Judge Rao, if I'm right that they can't take advantage of power, then it's just the regulation. And what does it mean for a quotation to be immediately and automatically executable? It means you can't slow it down at the exchange. And once it hits the exchange, you can't tinker with it. That's the whole meaning of immediately and automatically. And what they've done is say, well, not immediate, but as long as it doesn't take too long that we think it frustrates the purposes of the act. And they flipped the default of automatically. They never interpreted that word. Instead of automatic execution, you get automatic repricing. It's the exact opposite of what the regulation requires. So look, we have both the frontline argument, by the way, that it's not consistent with the reg. But the fallback argument, by the way, Judge Rao, doesn't attack at all 2016 or isn't inconsistent with it. Even if this de minimis gloss can somehow be put on the regulation, they still didn't offer any reasoned basis for saying, here's why extending that to displayed prices doesn't frustrate the purposes of the Exchange Act. There's no analysis of that in the order. As I say, it's two sentences at the top of page 83. And all it does is point back to 2016, which, of course, never looked at this extension for displayed prices. That argument we have regardless of what one thinks about 2016. Why would the interpretation of immediately and automatically be different for displayed versus not displayed? Well, I don't think it is our frontline argument. Our frontline argument is they got it wrong in 2016. Fine. They get the benefit of that for the purpose of the exchange. But if they're going to extend it, that's still the basis for their order. And this court is required by the APA to say, you put a gloss on this that is just not consistent with the regulation. But on the fallback argument, Judge Rao, absolutely, you could easily say, well, look, even if you think repricing doesn't affect for the stuff over here in the dark that you can't see, it does very much frustrate the purpose of the Exchange Act to do it with respect to displayed liquidity, right? Because the whole idea of this protected quote system, which doesn't apply to non-displayed, it's only for displayed quotes, the whole idea is you've got a best bid and a best offer. And those are driven by market forces. And once you have them, everybody is required to trade at them. You can't mess up the investor by trading at some different price than you could get on some other exchange. But the whole system, where the reason you offer that insurance to the investor is because you're confident that the bid and offer are actually the best prices out there in the market, driven by market forces. Here, they're requiring us to treat these things like they're the best bid or offer on the market. When we know that when we've got a large order, we're going to get to IEX on the very last piece, and it's going to fade away from us, right? We have to treat it like it's real when we know, in fact, it's phantom. And that's at odds with the system. And if the SEC wanted to try to do it for displayed prices, it at least needs to explain why it doesn't frustrate the purposes of the Act. It didn't even try here. Do my colleagues have any questions? I have one more question. So I guess I wanted to understand more about this question about asymmetry. So all incoming traffic has to cross over IEX's speed bump. That's correct, right? So it's a speed bump. Well, sorry, Judge Riley, it was for the nondisplayed, right? But this automatic repricing makes it asymmetrical because you put the quotation up there, and while everybody else is trying to hit it and get through the speed bump and execute against it, they're automatically repricing during that 350-microsecond delay. So it's now asymmetric, and it hurts just the rules with differential market effects. And isn't that the same difference here as it would be with other types of orders that move in that way? So I don't think so, Judge Ryle. I'm not here to tell you. Obviously, the question is whether it's unfair discrimination under the Act. Sure, there are some kinds of discrimination that are not unfair, but it seems to me if the commission wanted to justify this, we know it's discriminatory. We know it helps liquidity providers and hurts liquidity takers. I don't think anybody doubts that. So the question is just, is it unfair? And it seems to me they've got to do two things. They've got to be right or at least fair and reasoned about the benefits, right, what they're attacking. They've got to correctly understand the problem and what they get from it, and they've got to correctly understand the costs. And here they messed up both sides, right? They took as evidence of latency arbitrage something that's just evidence of normal large trading, and then they assumed away the costs and sort of said, well, you can deal with it through routing, but not looking at the costs of rerouting, which, as I tried to explain earlier, Judge Walker, are real. So if they'd done that on both sides of the ledger, maybe, as I said to you earlier, they'd be able to get away with a proposal like this, but in no event can they protect it. They have this innovation story they want to tell. That's fine. If they're right about this, let the market decide. Liquidity providers should flock to IEX if they're right, but what they can't do is let the platform itself start monkeying around and interfering with the trades and then claim that those are protected, not without a change to their rule. Their rule says immediately and automatically. The whole idea is if you've got the best bidder offer driven by the market, you get protection. It's not driven by the market here. It's driven by a formula that the market is using to readjust the price that is result of market forces. So if they want to do this, let them do it, but let them compete as they say they want to. Don't let them do it, having interfered with the market, and then claim this protection as benefit of Rule 611. And so your argument is that rule has to be updated through notice and comment rulemaking? Yes. If he wants to update it. Yeah. I mean, look, if they want to say it doesn't have to be immediately and automatically executable, you can have an fine. They've just got to choose different words. But again, Judge Rao, you don't have to agree with me on that, because even if I'm wrong and there is some de minimis exception that can be read into that language, notwithstanding its natural meaning, they still here did not do what they tried to do back in 2016. They didn't say, OK, we're extending it to displayed prices. Here's why that extension doesn't frustrate the purposes of the act. They pointed back to 2016. But of course, in 2016, they were never looking at displayed prices. So they've got an APA problem anywhere they go. Although I will say, I think that it's more fundamental than they recognize. My colleagues have any other further questions? OK, thank you. We will. We will hear next from the SEC. Good morning, and may it please the court. Emily Truparisi for the Securities and Exchange Commission. The commission's order in this case, approving IEX's proposal to offer its customers a new order type, was the product of reasoned decision making, supported by substantial evidence, and should be affirmed. I would like to go straight to this idea that it's large orders that are turning on the CQI, which is something that I heard from Petitioner's Council. The commission found, looking at the data in the record, is that, and it looked specifically at the extensive data in the record for what was happening at the time, the CQI in these small milliseconds and microseconds. And it found the stark disparity between the volume of marketable and displayed orders that were being executed versus non-displayed. And it's important to unpack that a little bit, because the displayed versus non-displayed shows that the activity is the orders that don't have the protection of the speed bump in the CQI. And the marketable orders shows that it's the aggressive orders taking it. It's not the midpoint orders. It's the ones that are crossing the spread aggressively. So there was extensive data in the record showing that the CQI only turns on when it's aggressive order taking, the hallmarks of latency arbitrage. Then you look at the qualitative data in the record that the commission had before it, numerous commentators wrote in saying that they could not trade in that manner. And that those that do use these large orders, these intermarket sweep orders, would not have any problem filling because the commission made extensive findings that accounting for this de minimis speed bump, IX's speed bump, is something that is commonplace in order routing. There would be no additional cost because it's commonplace order routing that people already have to take account of, because the delay at IX is no different than the geographical latencies that are inherent in all the different exchanges. What do you say to counsel's arguments that this is inconsistent with the immediate and automatic language of the existing regime? Sure, I'd be happy to go to argument, Your Honor. So we think that the language really here is right clear. And I think it's just a misunderstanding of what that rule 611 inquiry is getting at here. So rule 611 says that protected quotations can't be traded through. And then you have to use the definitions to figure out what protected means. So in order to be protected, it has to be automated. And that's really the question here. Are these quotes automated? It's important to take a step back and think about this. There's only two choices. It's either automated or it's manual. And it simply makes no sense to think of these quotes as manual. You think of a trading floor and a human sort of intervening. These quotes are not manual. They are automated because they immediately and automatically execute. And to focus on the word immediately, as I heard some of the discussion focusing on, it cannot be that it has to immediately. It has to mean literally there's no delay at all because all quotes experience some delay. And the commission explained this very clearly in its automated quotations interpretation that it issued in 2016. All quotes have some geographic latency. So you can't take immediate to literally mean there's no geographic delay whatsoever. So once you've taken account of the premise that there's some geographic delay, the question is, well, is this the minimus IEX delay any different? And it's not. The commission found it's well within the same kinds of geographical latency limitations that all other protected quotes get. So it's quite simply consistent. Ms. Priest, my question about that, I mean, immediately, I mean, isn't the natural meaning of immediate? I mean, sure, there might be a geographic latency, but if someone takes an intentional action to impose a delay, even if that delay is very small as it is here, I mean, doesn't that mean that it's not immediate? So when there's a geographic latency, you know, immediate is just sort of limited by technology, you know, how fast, how immediate can something be? But if someone takes an intentional action, an intentional delay, that doesn't strike me as consistent with the natural meaning of immediate. So your honor, Citadel made that exact argument in 2016 in their comment letter about the plain meaning and the commission addressed it in 2016. And it said, there's nothing about the intentionality of the delay, because it's simply the same from the perspective of the execution as the geographic delay. And so to the extent that the intentionality piece comes in, it does, it just doesn't come in in the, in the rule 611 analysis, because the rule 611 analysis is simply about the duration of time. And the intentionality piece doesn't come in there. It may come in in terms of... Go to the protected quotation side of things, right? Because, because the idea is that it's a not because of, you know, not because of an algorithm, as Mr. Wall said earlier. Well, it's protected, because it's, I mean, it's sort of just ipso facto from the definition, it's protected, because it's automated. And it's, it's automated, because it immediately and automatically executes. And it's important to go back, I think, your honor, to answer your question to the, to Reagan and Amass and what rule 611 was supposed to do. The idea there was to as opposed to manual trading, right? That was the specific purpose of the trade through exception in 2005. It gave the protected quote status to automated trading, as opposed to manual, because manual was too slow. And, and, and so the idea was to encourage automated trading. And there's just nothing that's not automated. I mean, it makes no sense to think of IEX's trades, the IEX's quotes as not, as not automated. It also doesn't, it just doesn't make any sense to think of only the D limit quotes as not automated, and therefore protected, because then you have a strange situation where some of IEX's quotes are protected, but only the D limit ones aren't and people trading don't know which is which. So it just, it just doesn't fit under the structure of the regulation itself, to not consider these, these quotes protected, and therefore automated. The questions about access to the liquidity and what Mr. Wall was referring to as phantom liquidity, that is addressed extensively by the commission, but under the Exchange Act analysis, as opposed to the Rule 11, excuse me, the Rule 611 analysis, and the commission found that there would not be extensive quote trading and everything, but that, that goes to that analysis. But the Rule 611 analysis is really very clear under the terms of the statute. You're either, you know, you're either automated or manual. You're automated. If you're automated, you're protected under Rule 611. What do you say to the, the argument that the SEC itself caused the problem of latency arbitrage that IEX is going to elaborate lengths to solve, because the cause of latency arbitrage was reg NMS? Your Honor, I think I would say that, you know, the issue before the commission here is, is, is whether the order is consistent with the Exchange Act. And so the commission has to take these things as they come. And, you know, the commission is balancing competing policy concerns in terms of the Exchange Act, and the, and 11 cap a and the, the congressional directives that is set out there to, to create this national market system. But the issue here in front of, in front of the court is simply whether IEX's proposal to offer this new order type to its customers is consistent with the Exchange Act. And here the commission found that it clearly was, there was extensive data in the record. And I didn't want to touch on, I see my time is, my time is up. And so I just wanted to quickly touch on if, with the court's permission, the idea that the commission ignored Citadel's data. It simply did not. Before you do that, though, and I understand it, it's, it's not perhaps directly related to the, the question before us, but it does seem to inform it. Do you, do you agree that REG NMS was sort of the, the first mover, the cause of all this latency arbitrage trouble that Citadel says doesn't exist, but IEX says does exist and SEC does exist and IEX is trying to, to fix? Your Honor, I think pinpointing the cause of, you know, a market phenomenon like, like latency arbitrage is a very difficult thing to do. And I don't think the commission has said anything in terms of that. I mean, certainly, you know, regulations can have consequences, both intended and unintended, but I, I don't think that we necessarily would the petitioner's characterization there. Ms. Bruce, can I ask you, since briefing in this case, have other exchanges sought to follow IEX's model? And if so, how has the SEC handled those proposals, if there have been any? I don't believe there have been any. Occasionally, someone will copy a certain feature of the plan, but then I, they, sometimes they will take them back. So I don't believe there is any copycat of this proposal in the market, precisely because to do so, you would need to already have the infrastructure. You would have, you need to have speed, speed bump and the CQI and all, you know, all the pieces that go up, that lead up to the delimit order yourself. And there are, there simply aren't any other exchanges that have all that infrastructure. I don't believe there are any other copycats. Thank you. Okay. Unless the court has any questions. No, thank you very much. And we would ask that the order be affirmed. Thank you. We'll now hear from Ms. Stetson. Good morning, Your Honors, and may it please the court. I'm Kate Stetson, representing IEX as the intervener. I want to make just a couple points on the primary argument in this case, the latency arbitrage issue and the solution that IEX devised. And then I do want to be sure to talk about this immediacy issue, Judge Sentelle and Judge Rao, that you raised as well. But just on the latency arbitrage point to begin, Judge Rao, I think one of your questions pointed at this as well. You know, this primary argument of citadels is a substantial evidence argument. That's unusual. You know, usually there's a lack of statutory authority argument or some other more significant APA hook. So here, what we are looking for is, was there substantial evidence in the record that latency arbitrage occurred? And the commission found yes. Those sites include Joint Appendix 62, 87, 89. When was latency arbitrage happening? The commission concluded based on IEX's several months' worth of data that it is happening in those microseconds right before a price changes. And I want to mention something that Mr. Wall said about the dogs barking if there is data of latency arbitrage. There are so many dogs. There are so many comments in this case from hundreds of investment advisors and companies representing trillions of dollars under management and millions of investors, including among others, high frequency traders, XTX, and Virtue. Virtue in particular does precisely what Citadel does. We can talk about what we're calling the retail issue in a minute if you all like, but understand that Virtue supported this delimit order and does exactly what Citadel does. With respect to Mr. Wall's other comment about this evidence that IEX put in over several months of data and which the commission evaluated and accepted as evidence of, quote, normal large trading, that is simply not true. What we are talking about is evidence of a huge amount of trading going on in the couple few microseconds before a price changes. I just happened to blink my eyes. That blink is about 200 times longer than the couple microseconds that we're talking about. So when Citadel talks about rooting 15% of its batched retail trades at that very moment, that is Citadel trying to hit that stale quote. That is what is happening. It is not evidence of normal large trading. With respect to the data that Citadel put forward, and I want to make clear there is a difference between disagreeing with a commenter and ignoring a commenter. I think a lot of what Citadel's brief tries to do is to shoehorn this into some model where the commission didn't ignore Citadel's data, didn't pay sufficient attention. There is a huge amount of work that the commission did in this order to take into account that data and to talk about it and explain it. One of the things that Ms. Parisi mentioned I think is important is that data comparing the difference between what's happening on the displayed order side and what's happening on non-displayed. The other thing that I would the entities doing those trades in those microseconds are proprietary trading firms, high-frequency traders. Those high-frequency traders include Citadel. Citadel is trading on behalf of retail investors. That's the phrase it uses. Citadel pays millions, hundreds of millions of dollars to brokers in order to get those retail orders so that it can batch them, route them as it sees fit, internalize them if necessary, and profit off of them. That's Citadel's model. That's why the retail investor is really just a red herring. Let me talk briefly. Just to make sure I understood what you just said, are you saying that when Citadel says that 40% of its trades on IEX are on behalf of retail customers, that in fact those trades could be using latency arbitrage tactics? 100% true. Yes. I hope Paul will address that in rebuttal if he disagrees. That is exactly right. That explains, as I mentioned, Judge Walker, why such a vast percentage of those trades is happening in those couple microseconds. You have dozens of commenters saying, we cannot use the technology that these high-frequency traders have in order to do this. There's a comment from Themis Trading that says, we are in the middle of a speed war that we never signed up to fight. The only people who are able to exploit those microseconds are high-frequency traders like Citadel and like Virtu, which supported this order. I know my time is up, but I do want to briefly- I do have one question. Citadel suggests that really it's IEX that's engaging in latency arbitrage by automatically repricing when the indicator is triggered. What do you make of that argument? To begin with, I think it's a little bit rich because I think as even some of Citadel's amici acknowledge, and I'm talking about the Vollmer brief at Footnote 5, there have been a number of innovations that other exchanges have implemented, including NASDAQ, NYSE, that are designed to either supply co-location, more auspicious location for a fee, or faster data connections for a fee. Far from latency arbitrage, what IEX was founded to do was to actually try to level the playing field so that the daily investors, the people who are actually putting retirement money into retirement funds that are managed by these long-term fundamental investors, so that they have a shot. Because no one else is able, as I said, to exploit those microseconds except for high-frequency traders. The other thing I guess to mention, Judge Rao, is when that price crumbles, that is what IEX is doing in those moments is essentially fighting fire with fire. Because the reason that the high-frequency traders are able to exploit those microseconds, those tiny moments, are because they are anticipating the price change. That's exactly what IEX is doing. So to say that we're engaging in latency arbitrage when we're actually trying to level the playing field, I think is a bit of a misdirection. On the immediate and automatic point, I don't think, Judge Rao, that it's right to say that a speed bump delay like IEX is somehow qualitatively different than, say, a geographic delay. Exchanges make choices all the time about where to locate their servers. Should we locate in Mahwah, Chicago, Miami? Exchanges make choices all the time, and they bill their high-frequency traders all the time for even locating servers in different parts of a room in order to make sure that those servers are more quickly connected. Exchanges for ages have tried to make sure that to the extent everybody's paying the same price, but are located in different parts of the room, that there's extra cable in order to make sure that there's no tiny latency between the server at the north end of the room and the server at the south end. All of these are examples of what we would call geographic latencies, but they're just as intentional as anything that IEX designed. And what the commission concluded in 2016 was that the immediate language means so de minimis that it doesn't interfere with fair and efficient trading. Now, the argument Mr. Wall offered, you know, Ms. Parisi is exactly right. This is exactly the argument that was offered in 2016, that immediate means immediate. Immediate, though, does not mean instantaneous. If you, Judge Rao, asked me to come to your chambers immediately, it would take me a while to get there. If you asked me to come to your chambers instantaneously, I would say, I'm sorry, I'm not capable of doing that. There's a difference between immediate and instantaneous, and that difference is within the commission's bailiwick and purview to interpret. You know, what it came down to in 2016 is exactly what it comes down to today, which is, does this de minimis delay interfere with the fair and efficient execution of an order? Is your view, Ms. Stetson, that immediate is ambiguous, and so we should defer to the SEC's interpretation? I think that is the SEC's position, and I can see the merit in that position for precisely the reason I just said. I think when people think about immediate, and you're not thinking in terms of these eye-blink moments, immediate might mean something very different. But when you're talking about these eye-blink moments, immediate has to mean something that's a little bit more accommodating. It's exactly why the commission, even with its protected quotes, builds in a one-second, essentially, grace period. No one is found to be in violation of the rule as long as that quote changed a second or less before, you know, whatever order they executed. There's an acknowledgment that the systems can only go as fast as the systems can go. And here, where you have a targeted, I'm sorry, Judge Santel. It bothers me that you just, what you just said, go as fast as the systems can go. The geographic delay, if you would, between immediate and instantaneous recognizes that as fast as the system can go. Here, you are deliberately putting a, or you're not, but the rulemaking is deliberately putting a delay into the course of the transaction that takes it out of the instantaneous, but may also take it out of the immediate. Isn't there a difference between the geographic delay that is inherent and unavoidable and the roadblock which is inevitable? Judge Santel, two answers. The first is that, as Ms. Parisi mentioned, that is exactly the argument that was made in 2016 in which the commission thoroughly evaluated and rejected. The second answer is, as I just mentioned to Judge Rao, the idea that geographic latencies are unavoidable is simply not the case. Exchanges make choices all the time about where to locate their servers, how fast to connect their particular customers to a particular server, where in the room, as I said, to locate the server. Those are all geographic latencies of some degree or another. So drawing a distinction between the kind of coil delay that we're talking about here with IEX and the kind of coil delays that are common in other servers, including, as I said, to try to equalize high-frequency traders' access if they are slightly different from each other in a room such that one gets to another one microsecond before, all of those are intentional choices. What the commission concluded in 2016 and reiterated here is that word immediate in this context means a delay that is so de minimis, it's not sort of you know, there's no human interference, which was the whole reason why this immediate order began to exist. It's so de minimis as not to have interfered with fair and efficient access. And I think what Mr. Rao's client is seeking is what we would say is unfair access, because they are seeking to exploit that tiny moment of time when a price is changing before other people, other liquidity providers, and liquidity takers are able to get there. And I want to perhaps end on this if there are no further questions. This is discrimination against a type of high-frequency trader that engages in predatory latency arbitrage. That is the discrimination, if we want to use that word that we're talking about. What the SEC concluded, what IEX submitted, and what the SEC evaluated and adopted was that this delimit order helps the market overall. It helps liquidity providers. It helps market makers. That's why you have XTX and Virtue joining these comments. It helps liquidity takers because it ensures that liquidity actually exists and isn't just shifting over to the dark markets or off exchange. This order helps the market overall. The people it doesn't help are the people who are trying to Is there any further questions? Were you saying, Ms. Hudson, that immediate immediately is ambiguous or you win if it's ambiguous and you also win if it's not ambiguous? The latter. I think what the SEC said in its brief, I think in a footnote, is that the interpretation is owed deference under Kaiser. That's clearly true, just given the length and the thoroughness of the consideration, the specificity of what we're talking about, the technicalities of what we're talking about. But if it's unambiguous, then we win also. So the answer is both. Thank you, Ms. Hudson. Mr. Hall, I'm not sure you have time left, but we will give you an Your right, Judge Walker. Regulation NMS did create the fragmentation. The protected quote stitches it back together, and it's important to enforce it. The language of the regulation is not anything about interference with fair and efficient trading. It says immediately and automatically executes an order. And you're right, Judge Rao, immediate, of course, things take time to do, and it doesn't mean you're not doing them immediately. But when you introduce an intentional delay, it's no longer immediate. And when you tinker with the quote, it's no longer automatic. Can you respond to Ms. Stetson's point that it's actually that there are intentional ways that traders affect geographic latency, so it's not really qualitatively different to have something like a speed bump? Sure. So two points. One, it's not true in practice. As we explained to page 372 of the JA, when we have a large order, Citadel sends it out to the exchanges simultaneously. Sure, there's a little bit of geographic latency as you go to the different exchanges, but the difference isn't large enough to allow anybody else to see what's happening on the other exchanges and react. So because we have a best execution obligation, we send it out everywhere at once. This is lengthening the delay, as Judge Sentel said, and it allows everybody at IEX to see what's going on, and then they reprice. And the second thing is, it's just not a natural way to use language, Judge Rao. Sure, I tell my kids to immediately make their bed in the morning. They got to get out of bed and turn on the light. Nobody thinks they didn't comply with my instruction. But we sure do if they get up and read books or play with toys for a while. And in case you think there's any doubt about that, all you need to do is look at the adopting release with rule 611. It says at page 534, it's not automated if you have any other type of intentional device that would delay the action. The commission read it exactly the way you do. But Mr. Wall, it seems that Citadel pays for those devices on several other exchanges. So tell me if I have the facts wrong. I'm imagining Citadel and Company X that are equidistant from an exchange. And so they send a communication to the exchange at the exact same moment. But Citadel has paid extra money to that exchange so that its receiver is a little closer than the competitor's receiver is. I'm imagining a room with computers in it, and there's like a box for Citadel and a box for the competitor. I'm sure this is probably vastly oversimplified, but Citadel pays the exchange money so that its receiver is in a better position, a better distance, a better location in that room than Company X. Does that happen? Judge Walker, I think maybe it did years and years ago. And it's a wonderful narrative, I grant you. It's a great story that Ms. Stetson told. But no, in this day and age, it's not true. We had a case last month about SkyBeams communicating between MAWA and the other things. I don't think there was any party in the case. They disagreed about a lot of stuff. But none of them disagreed that the scenario I described happens where companies pay a little more money to an exchange like NASDAQ or New York Stock Exchange to have their little box closer than everyone else's little box. It's very expensive real estate. Yeah, no, no, Judge Walker. What I was going to say was some exchanges deal with this by having standard length cables. And the exchanges that don't have that, everybody pays to co-locate. So XTX, Virtue, Two Sigma, all the firms that Ms. Stetson named that are Citadel's competitors, they're all right there. There is no latency. But aren't some... I'm not saying they're not paying for it. I'm saying there's no competitive advantage that would give rise to latency arbitrage because everybody's got the same connectivity and everybody's got the same data fee. They may be paying me... There's no co-location at an exchange that's slightly better than another co-location at an exchange? Judge Walker, I don't want to go that far. What I want to say is my understanding is that's not a common problem across the exchange when you talk to traders. And at a minimum, the commission didn't put on that kind of evidence. That's the interesting thing about the order. If that's true, what you're playing out and what Ms. Stetson said, it ought to be easy. We ought to come in with examples. There's facts on the ground. We could just show where the servers are and all the co-location stuff. The commission didn't do that. And it didn't even try to take actual trades and say, here's the latency arbitrage. It looked at aggregate statistics and said, see, those show that there's a lot of stuff going on when the signal is turning on. And this was the second point I was going to make in the rubble, which is none of that shows what's turning the signal on. So Ms. Stetson is right that at page 88 of the joint appendix, they say large orders don't turn it on. But when they say, as shown by the data above, all that they're pointing to on pages 87 and 88 is the stuff about there being a lot of trading when the signal is on. And we put in this actual order at page 372 of the joint appendix. We said, here's an actual order on behalf of retail investors. It triggered the signal just because it's a large order. Has nothing to do with arbitrage. And as I stand here today, having read everything in this case, I still don't understand what the commission's basic response is to the fact that this is the kind of trade that turns it on. Because it makes sense. You're taking a lot across a lot of exchanges. IEX is watching that. Of course, it's going to predict that the price is going to move. The signal is going to come on. By definition, it's probably a good size trade or good number of orders, right? Because you need a whole lot of liquidity. This is a small player. It doesn't have a lot of liquidity. So then it says, oh, we have a lot of things going on in our shop when the signal comes on. Of course you do. It's exactly what you would expect. All of the markout data, the spread crossing, it's exactly what you would expect to see if large orders turn the signal on. And so I would just point back to the commission's order. And the third thing I would say, Judge Walker, to go to your colleague with Ms. Stetson, that's not where the SEC started. Ms. Parisi said, look, it's commonplace to do this as a matter of routing. That's not true. Citadel sends these orders on behalf of retail investors to exchanges simultaneously when it's a large order. We explained that to the commission. There's nothing to the contrary in the record. Could we reroute and hold back orders and go to IEX first? We could with the costs I explained earlier, either higher costs or missed executions to retail investors who won't get the bulk of what they want because the IEX tail is wagging the New York Stock Exchange and NASDAQ dog. Now, Ms. Stetson takes it in another direction. She says, oh, well, they're batching, they're bundling. And so it's evidence of latency arbitrage. And with all respect to Ms. Stetson, that's false. We told the commission it's false. I'm happy to supplementally brief it. We have best execution obligations. Citadel does not that work if 15 percent of the retail orders are coming in when the signal is on? I mean, how do you explain that? Oh, so that part, I think, is fairly straightforward to address. Citadel handles more retail than anybody in the country. We have 40 percent of the retail orders on behalf of investors out there in the country. Right. So we have a lot of retail and we have some small orders and some one offs. And sometimes IEX is good for that. It doesn't have a lot, but sometimes it has a little bit of kind of random things. So you send a lot of small orders there. But the large orders that we sent, that's the 15 percent. And what we found is that that 15 percent were turning the signal on. And as we explained, ninety nine point three percent of them in volume were large orders. Once our retail orders got large enough, they triggered the signal and it came on. And the commission's response to that at page 88 is just Ipsy Dixit. All it says is, oh, but look at our data. There's a lot going on when the signal comes on. Of course, there's a lot going on. We're sending large retail orders. That's the 15 percent. Others are sending more large orders and fewer small orders in Citadel. So that's why even though it's only 15 percent for us, it creeps up to 24 percent of volume, 33 percent of orders. But it's all the same phenomenon. And just to close Judge Walker with where I was before, these retail orders, they're not like there's nothing misleading about saying on behalf of retail investors. The example we gave at page 372 of the joint appendix is is real. Maybe it's TD Ameritrade, maybe it's Schwab, maybe it's a pension fund, an institutional investor. They want a lot of shares. We don't hold that back and wait to take it to the market in some moment of arbitrage. We'd be violating best execution obligations if we did. And how did the 15 percent show up in that fraction, that tiny fraction of a second? Oh, Judge Rao, that's that is the key to the whole thing, right? Right there. They're not showing up when the signal is on. That's that's what the other side, they're triggering the signal, triggering the signal because IEX is sitting there and looking at these orders, hit the other exchanges and saying, wow, there's a spike in demand or a spike in supply. So the offer is going to go up or the bid is going to go down. And so they're turning on the signal and then the order gets there having hit the speed bump. And they treat that order once it hits as the volume or the order that they're talking about hitting when the signal is on. So, of course, there's a lot hitting when the signal is on. They have a formula designed to detect price changes and they can watch what's happening on other markets. It'd be sort of like, of course, there's a high correlation. Of course, you see crossing the spread. Of course, you see a lot of orders coming in. Of course, you see markout data showing that the price is running away from that. It's just a race between the technology of your client and the technology of IEX to go back and forth. I mean, isn't that ultimately in the market what's happening? I don't think so. It might be a race between Citadel and two Sigma and XTX and Virtue and all the other high frequency traders that, as I said, Judge Walker, have the same connectivity and same data. But no other exchange is doing this right. This is pretty novel. Exchanges are meant to be that's doing this, that's reaching in and repricing the quotes themselves. And that's a sort of novel thing. And to get back to where I started, if you conclude on the first issue that they can have the delimit order, even though they haven't shown you real evidence of latency arbitrage, and even if they have, Judge Walker, they haven't looked at the cost. They have not looked at the cost from retail and the cost of routing. Still during the argument, no one has addressed the cost of these rerouting changes. But even if you conclude that, you can't have it be protected under Rule 611 for the reason that Judge Citadel got out earlier. It just doesn't square with the language of the regulation, right? Protected quote is meant to stitch back that fragmentation that you were talking about, Judge Walker. And it does it by looking at the best bid and offer as a result of market forces. If they want to tinker with those, we don't think they should be allowed to. But what they can't do then is say, well, that should be treated the same as every other bid offer that is actually the result of market forces. Let them compete in the open marketplace. If liquidity providers like it, they'll go there, and liquidity takers will have to go to get the liquidity. That's what Canada did when they did the same thing. No protected quotes, let everybody have incentives to use the exchange, and then let the marketplace decide. And Mr. Walker, I'll stop, Judge Rao. No, no, Judge Walker, if you have another question, please, go ahead. I'll ask just one more. Your last statement about just letting the market force play out, here, it seems to be that's what IEX wants to do. And it's you who is going to a federal agency and saying, stop a private entity, IEX, from doing what they want to do. You're the one who's trying to regulate your way into a market victory. So all respect, Judge Walker, I think we see it a little bit differently, which is we don't want the exchanges, that's right, to interfere with the market forces themselves. Private parties in the marketplace through buying and selling should be determining prices, not the exchanges. The Exchange Act says they are meant to facilitate a fair and open market, not that they're meant to pick winners and losers and reprice their quotes. But even if you think I'm wrong about that, I think clearly they're not pro-market force on the Rule 611 side. If they really believed this innovation story, they would do what CBOE did when it submitted its proposal. It didn't say its quote should be protected. It said, let us do this. The commission disagreed. It flipped here for reasons it hasn't really addressed. But what IEX wants is the best of both worlds. It wants to be able to do the innovation, but then say that these quotes are protected, notwithstanding the regulatory text, so that it can lock liquidity takers into coming there, which drives up its revenues. Because let's be really clear, Judge Walker, IEX makes money in two ways. It makes money by having protected quotes at the best bid and offer and by having more trading volume. This change hasn't driven up in the real world its actual executions. It's not actually helping the market, but it does drive up the amount of liquidity it has at what's called the NBBO, the best bidder offer. And that means more money by the millions for Ms. Stetson's client. If they want to do that in the marketplace, let them do it. But they should not be able to do it virtue of rule 611, either because the regulatory text is clear or because they can't qualify for Kaiser because they flipped or because at a minimum, even if the de minimis exception exists, they didn't analyze it here in this order with respect to displayed prices. At a minimum, this court should vacate, remand with vacature of that part of the order. And obviously, we have not discussed today the remedy, but I think clearly this is the standard. If you're going to remand, you should vacate. Thank you very much. Case is submitted.
judges: Rao, Walker, Sentelle